UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

PETCHEM, INC.,

Plaintiff,

-vs-                                                        Case No.  6:04-cv-1080-Orl-28KRS

CANAVERAL PORT AUTHORITY,

Defendant.

## ORDER

This cause is before the Court on Plaintiff Petchem, Inc.'s ("Petchem") Motion for Determination That Canaveral Port Authority Is Collaterally Estopped to Re-Litigate Prior Findings (Doc. 35) and Defendant Canaveral Port Authority's ("Port Authority") memorandum in opposition (Doc. 39).  For the reasons set forth in this Order, Petchem's motion is granted in part and denied in part.

## I. BACKGROUND

The Port Authority is a port district and special taxing district of the State of Florida that owns and operates Port Canaveral, Florida.  The Port Authority has the authority to grant franchises to entities to perform various functions within the port.  Doc. 36, Ex. 1, at 1.  Petchem is a Connecticut corporation that provides tug and towing services at deep water ports.

On February 25, 2002, the Federal Maritime Commission ("FMC") issued an Order to Show Cause directing the Port Authority to show cause why it should not be found in

violation of section 10(b)(10) of the Shipping Act of 1984 ("Shipping Act"), 46 U.S.C. §
1709(b)(10), for its refusal to provide a hearing on the application for a tug and towing
franchise submitted by Tugz International, LLC ("Tugz").   FMC Order, Canaveral Port
Authority – Possible Violations of Section 10(b)(10), Unreasonable Refusal to Deal or
Negotiate, Docket No. 02-02, Doc. 36, Ex. 1, at 1.  That same day, the FMC also served an
Order of Investigation and Hearing into whether the Port Authority violated section 10(d)(1)
and 10(d)(4) of the Shipping Act "by failing to establish, observe and enforce just and
reasonable regulations and practices relating to tug and towing services" and "by giving an
undue or unreasonable preference or advantage to [Seabulk Towing, Inc. ("Seabulk")] , or
imposing undue or unreasonable prejudice or disadvantage with respect to other potential
tug providers, including [Tugz and Petchem]."   Exclusive Tug Arrangements in Port
Canaveral, Florida, Docket No. 02-03, Doc. 36, Ex. 2, at 1.

In an order issued on February 24, 2003, the FMC concluded that the Port Authority's
failure to provide Tugz a hearing on its application constituted an unreasonable refusal to
deal or negotiate in violation of section 10(b)(10) of the Shipping Act.  Doc. 36, Ex. 1, at 14-
16.  In reaching this conclusion, the FMC found, among other things, that:

> By controlling who may offer tug services and by granting that right only to one
> tug company, [the Port Authority] has made access to the terminals and
> terminal facilities dependent on a commitment to Seabulk, and thus has
> limited the prerogative of carriers to choose a tug operator.

Doc. 36, Ex. 1, at 13.  The FMC further determined that, although Seabulk's franchise to
provide tug and towing services was "denominated as [] 'non-exclusive,' it [was] a de facto
exclusive arrangement."  Id. at 12.

The matter of whether the Port Authority also violated sections 10(d)(1) and 10(d)(4) of the Shipping Act was resolved pursuant to a decision issued by Administrative Law Judge Michael A. Rosas ("Judge Rosas") on March 4, 2003. Doc. 36, Ex. 2. In concluding that the Port Authority violated sections 10(d)(1) and 10(d)(4), Judge Rosas determined that the Port Authority "gave undue and unreasonable preference to Seabulk by exempting it from having to demonstrate 'convenience and necessity' for its franchise, but then appl[ied] [that standard] to Petchem and completely ignor[ed] Tugz's application, thereby preserving Seabulk's monopoly over commercial tug service in [Port Canaveral]." Id. at 2. Shortly after Judge Rosas's decision, the Port Authority entered into a settlement agreement that provided for "the settlement of all civil penalties and other matters arising from [its Shipping Act] violations." See Order Granting Joint Petition to Approve Settlement and Discontinue Proceedings and Modifying the Findings of Jurisdiction ("Settlement Agreement"), Doc. 36, Ex. 3, at 2.

Petchem subsequently brought the instant action pursuant to 42 U.S.C. § 1983, alleging that the Port Authority's exclusive arrangement with Seabulk violated the dormant Commerce Clause. (Doc. 1). In furtherance of this claim, Petchem now seeks a determination that the Port Authority is collaterally estopped from relitigating the findings of the FMC and Judge Rosas that the Port Authority unreasonably granted Seabulk an exclusive franchise to provide tug and towing services in Port Canaveral to the detriment of other tug and towing service providers.

## II. DISCUSSION

As distinguished from claim preclusion, which "refers to the effect of a prior judgment in foreclosing successive litigation of the very same claim," United States v. Peppertree Apartments, 942 F.2d 1555, 1558 (11th Cir. 1991), collateral estoppel "bars relitigation of an issue previously decided in judicial or administrative proceedings if the party against whom the prior decision is asserted had a 'full and fair opportunity' to litigate that issue in an earlier case." In re St. Laurent, 991 F.2d 672, 675 (11th Cir. 1993) (quoting Allen v. McCurry, 449 U.S. 90, 95 (1980)).

The first question that arises from Petchem's motion is whether nonmutual collateral estoppel may be asserted against the Port Authority and, if so, whether Petchem's motion, in whole or in part, involves the assertion of nonmutual estoppel. Resolution of Petchem's motion otherwise depends on whether: (1) the issue which it seeks to preclude was resolved as part of a valid and final decision; (2) the issue in the prior administrative proceeding and the issue in the current action are identical; (3) there was an adequate opportunity to litigate the issue in the administrative proceeding; (4) the issue was actually litigated and decided in the prior action; and (5) the findings on the issue were necessary to the administrative decision. See Pantex Towing Corp. v. Glidewell, 763 F.2d 1241, 1245 (11th Cir. 1985).[1]

---

[1] The Court has slightly altered the framework set forth in Pantex Towing for two reasons. First, assuming that what was originally the first prong of the Pantex Towing test– "identity of the parties or their privies"–refers to the requirement of mutuality, that requirement has been all but abandoned by the federal courts. See, e.g., Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 327 (1979); In re Bilzerian, 153 F.3d 1278, 1281 (11th Cir. 1998) ("Collateral estoppel . . . bars relitigation of an issue previously decided in judicial or administrative proceedings *if the party against whom the prior decision is asserted* had a 'full and fair opportunity' to litigate that issue in an earlier case.") (emphasis added); 18A Charles

## A. THE RULE OF MUTUALITY

The rule of mutuality forbids a party from using a prior judgment against another party unless "both parties [are] bound by the judgment." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 327 (1979). Although the rule has largely been abandoned by the federal courts, mutuality remains a requirement whenever collateral estoppel is asserted against the federal government or a state government.

In United States v. Mendoza, the Supreme Court held that nonmutual collateral estoppel, though generally available, "simply does not apply against the [federal government]." 464 U.S. 154, 159-63 (1984). The Mendoza Court's decision rested primarily on the various distinctions between the federal government and private litigants. The Court initially observed that:

> Government litigation frequently involves legal questions of substantial public importance; indeed, because the proscriptions of the United States Constitution are so generally directed at governmental action, many constitutional questions can arise only in the context of litigation to which the Government is a party.

Id. at 160. As a result, the Court concluded, "the Government is more likely than any private party to be involved in lawsuits against different parties which nonetheless involve the same legal issues." Id. Furthermore, the Court noted that, "[u]nlike a private litigant who generally does not forgo an appeal if he believes he can prevail, the [Government] considers a variety of factors, such as . . . limited resources . . . before [exercising] an appeal." Id. at 161. In

---

A. Wright, Arthur R. Miller, Edward H. Cooper, Federal Practice & Procedure § 4464 (2d ed. 2005) (The "traditional [mutuality] rule has been abandoned as to issue preclusion by federal courts."). Second, due to the essential nature of the finality requirement, it is only appropriate that it be considered as one of the elements in the collateral estoppel test.

light of all these facts, the Court, in essence, determined that subjecting the Government to nonmutual estoppel would leave it with a Hobson's choice: either abandon a discretionary posture toward appeals and "appeal every adverse decision" or suffer preclusive consequences in innumerable subsequent cases.  Id.

Less than two years after   Mendoza  was decided, the Eleventh Circuit in  In re Hercules Carriers, Inc. held "that the rationale outlined by the Supreme Court in Mendoza for not applying nonmutual collateral estoppel against the government is equally applicable to state governments." 768 F.2d 1558, 1579 (11th Cir. 1985).  In reaching this conclusion, the Eleventh Circuit emphasized that the Court in Mendoza "did not differentiate between federal governmental interests and state governmental interests" or suggest "that the concerns [it] expressed . . . were peculiar to the federal government."   Id.  With this language, the Eleventh Circuit, in much the same fashion as it contended the   Mendoza Court had done, left open the possibility that other government entities might also be covered under the Mendoza rationale.

While there is no basis in this case for concluding that the Port Authority is a state government in the sense contemplated by the court in Hercules Carriers and certainly is, in no sense, the federal government, there is no question that it is a governmental entity.[2]  As

_____

[2] The Port Authority's reliance on this Court's May 13, 2005 Order (Doc. 34) for the proposition that it is "undisputedly an arm of the State" is misplaced.  Doc. 39, at 5.  Far short of determining that the Port Authority was an arm of the state of Florida, this Court merely recognized the Port Authority's obvious status as a "governmental entity."  Perhaps even more curious is the Port Authority's reliance on a supposed admission by Petchem that the Port Authority "is a political subdivision of the State of Florida."  Cases addressing whether a particular governmental entity enjoys Eleventh Amendment immunity clearly distinguish between arms of the state and political subdivisions.  See, e.g., Brown v. E. Cent.

light of all these facts, the Court, in essence, determined that subjecting the Government to nonmutual estoppel would leave it with a Hobson's choice: either abandon a discretionary posture toward appeals and "appeal every adverse decision" or suffer preclusive consequences in innumerable subsequent cases. Id.

Less than two years after Mendoza was decided, the Eleventh Circuit in In re Hercules Carriers, Inc. held "that the rationale outlined by the Supreme Court in Mendoza for not applying nonmutual collateral estoppel against the government is equally applicable to state governments." 768 F.2d 1558, 1579 (11th Cir. 1985). In reaching this conclusion, the Eleventh Circuit emphasized that the Court in Mendoza "did not differentiate between federal governmental interests and state governmental interests" or suggest "that the concerns [it] expressed . . . were peculiar to the federal government." Id. With this language, the Eleventh Circuit, in much the same fashion as it contended the Mendoza Court had done, left open the possibility that other government entities might also be covered under the Mendoza rationale.

While there is no basis in this case for concluding that the Port Authority is a state government in the sense contemplated by the court in Hercules Carriers and certainly is, in no sense, the federal government, there is no question that it is a governmental entity.[2] As

_____

[2] The Port Authority's reliance on this Court's May 13, 2005 Order (Doc. 34) for the proposition that it is "undisputedly an arm of the State" is misplaced. Doc. 39, at 5. Far short of determining that the Port Authority was an arm of the state of Florida, this Court merely recognized the Port Authority's obvious status as a "governmental entity." Perhaps even more curious is the Port Authority's reliance on a supposed admission by Petchem that the Port Authority "is a political subdivision of the State of Florida." Cases addressing whether a particular governmental entity enjoys Eleventh Amendment immunity clearly distinguish between arms of the state and political subdivisions. See, e.g., Brown v. E. Cent.

such, many of the facts which distinguish the federal government or a state government from a private litigant also distinguish the Port Authority.  Most critically, as a government entity, the Port Authority is more likely than the average private litigant "to be involved in lawsuits against different parties which nonetheless involve the same legal issues," see, e.g., Tugz Int'l v. Canaveral Port Auth., Order on Motion for Summary Judgment, Doc. 68, No. 6:03cv1782 (M.D. Fla. Feb. 3, 2005), and "[u]nlike a private litigant who generally does not forgo an appeal if he believes he can prevail," the constraint of limited resources surely demands that the Port Authority take a more cautious approach.  Indeed, whatever differences there may be between the litigation burdens faced by the Port Authority and the federal government or the Port Authority and a state government, they are, in the main, a matter of degree and not of kind.[3]  The Court finds, therefore, that nonmutual estoppel does not apply to the Port Authority and that the proceedings before the FMC and Judge Rosas must meet the test of mutuality.

---

Health Dist., 752 F.2d 615, 617 (11th Cir. 1985) ("We therefore, must examine [Appellant's] legal posture, based on facts developed in the district court, to determine whether it is an arm of the state or an independent 'political subdivision to which the Eleventh Amendment does not extend.'") (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977)).

[3] In the area of limited resources, the Port Authority is most likely more constrained than either a state government or the federal government.  Furthermore, there can be little doubt that the litigation burdens of a state government are considerably different than those of the federal government, yet that did not prevent the Eleventh Circuit from finding the Mendoza rationale applicable to state governments.

### 1. Rule of Mutuality Applied to the FMC Proceedings

Petchem maintains that it was an intervenor in the FMC proceedings.  Assuming this were true, the FMC decision would have been binding on Petchem and the test of mutuality would thus be satisfied.  Petchem's assertion, however, is simply not reflected in the record.  As the Port Authority points out, the record reveals only that Tugz International, LLC ("Tugz") and Seabulk were intervenors in the action before the FMC.  <u>See</u> Doc. 36, Ex. 1; <u>see also</u> <u>Tugz</u>, No. 6:03cv1782, at *3 (noting only Tugz and Seabulk Towing as intervenors in the FMC proceeding).  Accordingly, Petchem's motion for collateral estoppel, insofar as it seeks to preclude any determination made pursuant to the FMC proceedings, fails under the rule of mutuality.

### 2. Rule of Mutuality Applied to the Proceedings Before Judge Rosas

There is no dispute, however, that Petchem was an intervenor in the proceedings before Judge Rosas.  <u>See</u> Doc. 39, at 5.  Thus, as to those proceedings, the rule of mutuality is satisfied and additional analysis is merited under the general collateral estoppel test.

### B. APPLICATION OF THE GENERAL COLLATERAL ESTOPPEL TEST TO JUDGE ROSAS'S DETERMINATION

As set forth below, Petchem's motion, to the extent that it seeks to preclude relitigation of Judge Rosas's determination that the Port Authority granted Seabulk a monopoly over the Port Canaveral tug and towing services market, satisfies all five prongs of the collateral estoppel test.

### 1. Finality of Judge Rosas's Decision

The Port Authority contends that the issues decided by Judge Rosas were never actually litigated because the proceedings before him were ultimately settled. Notwithstanding the Port Authority's characterization of its argument, the issue that the Port Authority raises more generally concerns whether Judge Rosas's decision was sufficiently final for collateral estoppel purposes.

The Port Authority's position finds support in the view of finality sometimes held by the Fifth Circuit, which provides that "judicial finality" for collateral estoppel purposes requires a "formal entry of judgment." <u>AAF-McQuay, Inc. v. Northbrook Prop. and Cas. Ins. Co.</u>, No. 5:96cv158, 1998 WL 1978564, at *1-2 (E.D. Tex. 1998) (stating the view and chronicling the Fifth Circuit's various changes of heart). In general, under this view, an interlocutory order entered prior to settlement has no preclusive effect. <u>See</u> <u>Avondale Shipyards, Inc. v. Insured Lloyd's</u>, 786 F.2d 1265, 1271 (5th Cir. 1986) (appealable final order generally required for collateral estoppel).

The Eleventh Circuit, however, has rejected a formalistic approach to finality and instead has said that a "final judgment" for collateral estoppel purposes "includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded preclusive effect." <u>Christo v. Padgett</u>, 223 F.3d 1324, 1339 n.47 (11th Cir. 2000) (quoting Restatement (Second) Judgments § 13). Thus, while preclusive effect should not attach to an "avowedly tentative" decision, a decision that has been supported by a reasoned opinion and that "was subject to appeal or was in fact reviewed on appeal" should, in most instances, qualify as a final decision for collateral estoppel purposes, regardless of

whether the decision was entered as a final judgment.  Restatement (Second) Judgments § 13; see also Dana v. E.S. Originals, Inc., 342 F.3d 1320, 1323-24 (Fed. Cir. 2002) (finding that partial summary judgment is sufficiently final for collateral estoppel purposes under the standard set forth by the Eleventh Circuit in Christo).

Under this flexible view of finality, Judge Rosas's decision was, without question, sufficiently final.  First, there is absolutely no indication that Judge Rosas intended for his decision to be tentative in any way.  Indeed, after Judge Rosas issued his decision, the only matter left to be determined was the extent of the Port Authority's damages.  All substantive issues had been resolved.  See Order Granting Joint Petition to Approve Settlement and Discontinue Proceedings and Modifying the Findings of Jurisdiction, Doc. 36, Ex. 4, at 8. In addition, Judge Rosas's decision not only came on the heels of extensive proceedings, but was supported by a thoroughly reasoned forty-one page opinion.   Finally, notwithstanding the fact that the proceedings before Judge Rosas were resolved pursuant to a settlement agreement which stipulated that the parties forfeit their rights to appeal, Judge Rosas's decision was nevertheless "subject to appeal."   See id. (noting that the parties were giving up their right to appeal as part of their settlement).  That Judge Rosas's decision was not actually appealed merely means, naturally enough, that the decision was *not appealed* and not that it was *not subject to appeal*.  Had the Port Authority or any other party truly desired to appeal Judge Rosas' decision, it could have done so in the stead of settlement.[4]

---

[4]  While the Eleventh Circuit has not yet addressed the related question of whether a settlement agreement can somehow erase the preclusive effect of an earlier order, the court's position on finality plainly supports the view that the preclusive effect of interlocutory

## 2. Identity of Issues

"Under the dormant Commerce Clause, if a state law has either the purpose or effect

of significantly favoring in-state commercial interests over out-of-state interests, the law will

'routinely' be invalidated 'unless the discrimination is demonstrably justified by a valid factor

unrelated to economic protectionism.'" Walgreen Co. v. Rullan, 405 F.3d 50, 55 (D.P.R.

2005) (quoting West Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 192-93 (1994)) (additional

citation omitted).  Under this standard, Judge Rosas's determination that the Port Authority

granted Seabulk a monopoly over the Port Canaveral tug and towing services market is of

---

orders is unaffected by a subsequent settlement.  See Siemens Med. Sys., Inc. v. Nuclear Cardiology Sys., Inc., 945 F. Supp. 1421, 1435-37 (D. Colo. 1996).  Simply put, if a decision is final for collateral estoppel purposes, there is no basis in law or logic for the view that a settlement agreement or any other event can subsequently render that final decision less than final.  See id.

From a policy standpoint, allowing a party to erase the collateral estoppel consequences of a decision by way of settlement has the lure of avoiding the placement of additional costs on settlement and also of ensuring "that the losing party [in a case] has the opportunity to appeal an unfavorable ruling that could be accorded preclusive effect in future proceedings."  Jarosz v. Palmer, 766 N.E.2d 482, 536 (Mass. 2002).  An equally if not more persuasive view, however, provides that, although attaching preclusive effect to interlocutory decisions may sometimes discourage settlement:

> [P]reventing settlement may actually conserve judicial resources. The only parties that will be discouraged from settling will be those who fear future, related liability based on negative [interlocutory] orders. If such parties are encouraged by issue preclusion not to settle the first action and to appeal instead, litigants and the court in a subsequent action will be saved the time and expense to relitigate and second guess an already-decided issue. In addition, it may not result in additional appeals because the subsequent action is just as likely to be appealed as the first.

See Siemens, 945 F.Supp. at 1437.  As far as the forfeiture of appeal is concerned, that is a fate that the settling party brings upon itself.

obvious relevance.  At a minimum, a determination that the Port Authority granted Seabulk a monopoly clearly establishes that the Port Authority favored Seabulk over other companies.[5]

### 3. Adequate Opportunity to Litigate

The only argument that the Port Authority raises in regard to the sufficiency of Judge Rosas's proceedings is that its case was not tried by a jury.  This argument was squarely addressed and rejected by the Supreme Court in Parklane Hosiery Co. v. Shore, 439 U.S. 333, 337 (1979).[6]

It is not surprising that the Port Authority does not otherwise contend that it had an insufficient opportunity to litigate.  As Petchem points out, "[t]he proceedings before Judge Rosas included five months of formal discovery, the submission of written testimony by the parties . . . , and live 'cross-examination of designated witnesses'" taking place over several days in Washington, D.C. and Titusville, Florida.  Doc. 36, at 3 (quoting Doc. 36, Ex. 2, at 3-4).  In the absence of any indication that the quality of these proceedings was somehow deficient, it must be assumed that proceedings so extensive provided the Port Authority with ample opportunity to litigate any issues decided by Judge Rosas.

---

[5] Whether Seabulk was an in-state entity or whether Petchem and other companies were out-of-state entities are, however, issues which remain to be settled.  It also remains to be determined whether the Port Authority's preferential treatment of Seabulk can be "justified by a valid factor unrelated to economic protectionism."

[6] For reasons very much unclear to the Court, the Port Authority has now twice invoked Justice Rehnquist's dissent in Parklane to argue that an adequate opportunity to litigate depends on the provision of a jury.  See also Tugz, No. 6:03cv1782, Doc. 68, at 12 n.7.

### 4. Actual Litigation

The Port Authority correctly contends that settlement agreements generally do not enjoy preclusive effect.  The reason for this is that "actual litigation" of outstanding issues "is always missing when cases are settled."[7]  Richardson v. Ala. State Bd. of Educ., 935 F.2d 1240, 1245 (11th Cir. 1991).  The problem with the Port Authority's argument is its lack of any bearing on analysis of Petchem's motion.  Petchem's motion does not seek to preclude any determinations reflected in the settlement agreement.  Rather, the motion's focus is Judge Rosas's decision, which the Court has already determined to be a valid and final decision for collateral estoppel purposes.

In terms of whether there was actual litigation leading up to Judge Rosas's decision, the record shows that the issue of whether the Port Authority maintained an exclusive, or monopolistic, relationship with Seabulk was a central issue in the proceedings before Judge Rosas.  Thus, the actual litigation requirement, which is generally met by no more than "designation of the [issue] as one for trial . . .  even if no evidence is introduced," is easily satisfied in this case.  Pleming v. Universal-Rundle Corp., 142 F.3d 1354, 1359 (11th Cir. 1998).

### 5. Necessary to the Administrative Decision

Section 10(d)(4) of the Shipping Act provides that "[n]o marine terminal operator may give any undue or unreasonable preference or advantage or impose any undue or unreasonable prejudice or disadvantage with respect to any person."  Judge Rosas's finding

---

[7]  To view the language of Richardson as additionally referring to issues already adjudicated would create a plain conflict with the Eleventh Circuit's approach to finality.

that the Port Authority granted Seabulk a monopoly over the Port Canaveral tug and towing services market was clearly both relevant and necessary to his legal determination that the Port Authority violated section 10(d)(4) by giving Seabulk an "undue [and] unreasonable preference or advantage."

## III. CONCLUSION

To the extent that Petchem's motion seeks to preclude relitigation of Judge Rosas's determination that the Port Authority granted Seabulk a monopoly over the Port Canaveral tug and towing services market, the motion satisfies the test of mutuality and all the elements of the general test for collateral estoppel. Petchem's motion as to the determination of the FMC, however, fails under the test of mutuality. Thus, Petchem's Motion for Determination That Canaveral Port Authority Is Collaterally Estopped to Re-Litigate Prior Findings (Doc. 35) is **GRANTED** to the extent that it seeks to preclude Judge Rosas's determination that the Port Authority granted Seabulk a monopoly over the Port Canaveral tug and towing services market and otherwise is **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida this _2 d_ day of August, 2005.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party

-14-